CLALLAM LUMBER CO. v. CLALLAM COUNTY et al.

(Circuit Court of Appeals, Ninth Circuit. August 6, 1917.)

Nos. 2905-2908.

1. TAXATION ⬥338—ASSESSMENT—MODE OF ASSESSMENT—TIMBER LANDS.

The action of the assessor of a county containing large tracts of timber lands in dividing such lands into zones for the purposes of assessment *held* not illegal, under the laws of the state requiring equality in the assessment of all property, where the zones were determined by the character and value of the timber in each, and its location with reference to the cost of marketing.

2. TAXATION ⬥494(3)—LEGALITY OF ASSESSMENT—REVIEW BY COURTS.

Owners of timber lands *held* not entitled to relief in equity against the assessment of their lands, affirmed by the board of equalization after hearings, in the absence of proof establishing fraud, or discrimination against any class or owner, or showing the violation of any fundamental principle of uniformity, and where the testimony as to value, while conflicting, fairly sustained the assessment made.

⬥For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. TAXATION ⟨⟩494(3)—ASSESSMENT—EFFECT OF ERROR IN ASSESSMENT OF OTHER PROPERTY.

 Error in the assessment of a certain class of property through a misapprehension of the law will not invalidate the assessment of other property.

Appeal from the District Court of the United States for the Northern Division of the Western District of Washington; Edward E. Cushman, Judge.

Suit in equity by the Clallam Lumber Company against Clallam County and Clifford L. Babcock, Treasurer, heard with suits by the Clallam Lumber Company against Clallam County and Herbert H. Wood, Treasurer, and by Charles H. Ruddock and Timothy H. McCarthy against Clallam County and Clifford L. Babcock, Treasurer, and against Clallam County and Herbert H. Wood, Treasurer. Decrees for defendants, and complainants appeal. Affirmed.

The above-entitled four cases were consolidated for trial in the District Court, and as they are controlled by substantially the same evidence and by the same principles of law they may be considered in one opinion. They are suits in equity against Clallam county, Wash., and the treasurer of the county, to vacate and set aside the taxes levied upon certain lands by the county, or such amount of taxes as may be found to have been unjustly levied, and to enjoin the issue of delinquency certificates against lands levied upon, and sale by the county treasurer based upon alleged fraudulent and unlawful assessment and equalization of taxes.

Case No. 2905: The Clallam Lumber Company, appellant, to be called plaintiff, is a Michigan corporation owning 41,000 acres of timber lands in Clallam county. The complaint is elaborate, but in substance charges that in 1913 the assessor of the county and the board of equalization, in equalizing, arbitrarily and unlawfully overvalued the lands in pursuit of a policy begun and followed by the tax officials for years prior to 1913, whereby timber lands belonging to nonresidents and situate principally in the western portion of Clallam county were assessed at grossly higher values in proportion to their true value in money than all other classes of property in the county, particularly agricultural and town lots in Port Angeles, the county seat; that in the eastern district are well-settled farming communities, the voting power of the county being in the east and the middle districts; that in 1912 and 1913 the board of equalization was composed of five members, three residing in Port Angeles, one in the eastern and one in the western district; that the members of the board of equalization who resided at Port Angeles owned property at Port Angeles, and that to favor Port Angeles and themselves, and to put the burden of taxation upon timber lands owned principally by nonresidents, the assessor and the members of the board of equalization residing at Port Angeles conspired with the east end commissioner to value property in and about Port Angeles at a low sum, but to value timber lands in the west end, and particularly the timber lands of plaintiff, at high figures; that the citizens of Port Angeles desired timber owners to build railroads into the interior and to bring their logs from the interior to Port Angeles to develop that city; that the assessing officers of the county meant to assess timber lands in the west end of the county at exorbitant sums to compel the owners to cut timber and build railroads and mills and aid the development of the county; that the lands of plaintiff are without facilities for transportation, most of them being cut off from the Straits by mountains, and that it is beyond the means of plaintiff to build railroads to transport the logs; that on the Straits of Fuca there lie fine bodies of timber which can be and are logged to the Straits; that in assessing the timber lands the officers divided the lands into zones, assessing all timber lands in one district at the same valuation per thousand feet; that the zones were laid off

without reference to the real value of the timber lands within them, or to the elements which would go to make up uniformity of value, and without regard to the system of cruises adopted by the county on its timber lands, with the result that plaintiff's and other interior timber lands were valued higher in proportion to their real value than the timber lands lying along the Straits tributary to tidewater and operating railroads and presently marketable, the object being to compel plaintiffs and other owners of idle timber lands to cut and operate; that the custom in the state of Washington was to assess property at from 35 to 50 per cent. less than its actual value, and that while the assessing officers of Clallam county claimed for 1913 that they assessed and equalized on a basis of 53 per cent. of its true value, in fact, property at Port Angeles was assessed and equalized at not to exceed 10 to 20 per cent., that farming lands in the eastern end of the county were assessed at not to exceed 25 to 30 per cent., while timber lands in the interior were put at sums greatly in excess of 53 per cent., and plaintiff's lands, being in the interior, at nearly 83 per cent., of their fair value. Plaintiff further alleges that it appeared before the county board of equalization in 1912 and 1913, and protested, but without avail, and that the protests of plaintiff were arbitrarily overruled; that at the time of the assessment the fair value of the plaintiff's lands did not exceed $2,050,000, and that under the custom prevalent should not have been valued at more than $1,025,000, but that the lands were wrongfully assessed at a sum exceeding 50 per cent. of their true value; that the levy for 1913 aggregated $50,049.59, whereas a fair levy would not have exceeded $30,000; and that by the fraudulent practices followed there were unlawfully imposed upon the lands described in a schedule, which is attached to plaintiff's bill, taxes for 1913 to the amount of at least $20,049.59 in excess of taxes which might be lawfully imposed. Plaintiff avers that in 1914 it tendered and paid into court $30,000. The defendants answered, denying all charges of conspiring, discrimination, partiality, injustice, and fraud, denying that it was the custom of assessing and taxing boards to assess property at from 35 to 50 per cent. of its true value, or that any different basis than the true value of plaintiff's property was employed, and set up that the lands of plaintiffs bear timber of exceptionally high grade and are proportionally more valuable than smaller or isolated tracts in the same localities; that in 1908 the county employed proper timber cruisers, who made detailed estimates of character and quality of timber standing upon the various legal subdivisions of land in the county, and that all lands in private ownership were cruised and platted into tracts and zones, with plats and detailed reports concerning physical characteristics, agricultural possibilities of lands, and other matters, which were filed, by which the assessing officers could determine the value for assessment and taxation; that the assessments made were the result of honest and deliberate judgment, after careful investigation and fair hearing, as required by the laws of the state of Washington in force in 1912 and 1913 (Laws of 1897, chapter 71). After trial the District Court held that plaintiffs had failed to make a case entitling them to relief, and the complaints were ordered dismissed. The decree provided for a credit by the county upon the taxes levied upon the plaintiff's land in the sum of $29,400, to be apportioned among the lands in the specific manner set forth in the decree. The credit matter presented itself in this way: The plaintiff had paid into court $30,000 on November 7, 1914, as a tender. This sum, less $600 clerk's commission was by stipulation of the parties paid into the county of Clallam and receipted for as a payment into the county of Clallam, and receipted for as a payment pro tanto without prejudice to the contention of either party.

Case No. 2907, Clallam Lumber Company v. Clallam County and Wood: Relates to the same lands as in No. 2905, but the taxes involved are 1914. It is claimed that, if properly assessed at a value of not more than 50 per cent., the tax would not have exceeded $25,466, but that they were taxed $42,960, or an unlawful excess of $17,494.78. Tender of $25,466 was made, and the decree ordered the suit dismissed, without credit for any payment.

Case No. 2906, Ruddock and McCarthy v. Clallam county and others: In this action the assessment of lands for the taxes of 1913 is involved. The plaintiff's lands, consisting of 7,941.06 acres, were situated in zone No. 2.

The aggregate assessment for 1913 was $479,990, and it is claimed that the total assessable value of the lands on March 1, 1912, did not exceed $550,000, and that under the law and practice the assessment should not have been more than $275,000. The tax amounted to $15,809, as against $9,250, which plaintiffs say should have been the maximum assessed. The tender in this case was $9,250, and the decree ordered the county to credit this sum, less clerk's commission, toward the taxes on plaintiff's land for 1913 pro tanto.

Case No. 2908, Ruddock and McCarthy v. Clallam County and Wood: The taxes involved in this suit were upon the same lands as in case No. 2906, but were those assessed for 1914. The contention here is that, while the aggregate value of plaintiff's land did not exceed $550,000 on March 1, 1914, and should not have been assessed at more than 50 per cent. of this value, they were in fact assessed at $561,395, or 102 per cent. of their actual value; that the taxes ought not to have exceeded $6,905, but they amounted to $14,095. Tender of $6,905 was made, and the decree ordered the suit dismissed, without credit for any payment.

Earle & Steinert and Peters & Powell, all of Seattle, Wash. (Butterfield & Keeney, of Grand Rapids, Mich., of counsel), for appellants.

Frank L. Plummer, of Port Angeles, Wash., and John E. Frost, Edwin C. Ewing, Richard Saxe Jones, and C. F. Riddell, all of Seattle, Wash., for appellees.

Before GILBERT and HUNT, Circuit Judges, and WOLVERTON, District Judge.

HUNT, Circuit Judge (after stating the facts as above). The briefs and arguments of appellants are addressed principally to these points: (1) The practice of the assessor in dividing the timber lands into zones and the classification by zone system for the purpose of assessment and valuation; (2) the measure of value adopted by the defendants for assessment and for taxation; (3) the question of the existence of·a conspiracy and fraudulent combination of tax officials to discriminate unjustly against plaintiff's lands and in favor of other property.

The Constitution of Washington provides that all property not exempt shall be taxed in proportion to its value, to be ascertained as provided by law, and that uniform and equal rate of assessment and taxation on all property according to its value in money shall be provided, and that the law shall secure a just valuation for taxation of all property, so that every person and corporation shall pay a tax in proportion to the value of his, her, or its property. Article 7, §§ 1 and 2, Constitution of Washington.

In 1912 the laws of Washington provided that real property subject to taxation should be listed and assessed biennially on every even-numbered year with reference to its value on the 1st day of March preceding the assessment, that real property should be listed according to the largest legal subdivision as near as practicable, and that all property should be assessed "at its true and fair value in money"; the true cash value being that at which the property would be taken in the payment of a just debt from a solvent debtor. It was further provided that, in assessing any tract of real property, the value of the land exclusive of improvements should be determined, and the value of all improvements and structures thereon. 2 Remington & Ballinger's Code, §§ 9101, 9112, 9113.

In 1913, section 9112 was amended by provision that all property should be assessed at not to exceed 50 per cent. of its true and fair value in money. Laws of Washington 1913, p. 438, § 1. It is provided that, when the assessor shall begin his work, that official is required to determine as near as practicable the true or fair value of each tract of real property listed for taxation and shall enter the value thereof in proper books. Section 9102. Section 9200 makes the county commissioners, the county assessor, and the county treasurer, or a majority of them, a board of equalization of the assessment of the property of the county. The board is required to examine and compare the returns of the assessment of the property of the county and proceed to equalize the same so that each tract or lot of real property and each article or class of personal property shall be entered upon the assessment list at its true and fair value according to the measure of value used by the county assessor in such assessment year and subject to certain rules. The rules authorized the raising of value of real property, which in their opinion is returned below its true and fair value, to a sum believed to be the true and fair value, after notice to the owner or agent, or they may lower values to what is fair, and they may raise the value of each class of personal property after notice, and they may reduce the valuation of personal property which in their opinion is rated above its true and fair value. By section 9212 county taxes are levied in specific amounts, and rates per centum determined from the amount of property as equalized by the board of equalization each year, except such general taxes as may be definitely fixed by law. All taxes are payable on or before the 31st of May in each year; but one assessment may be paid before that date, and time for the payment of the balance extended to the 30th of November following.

It can be said generally that, under the system prevailing in the state, taxes are assessed on property as of the value of March 1st, equalization by the board of equalization is had in October, and taxes upon real property are payable on May 31st. Inasmuch as assessment on real property was made biennially in the even-numbered years, taxes upon real property for 1913 were payable in May, 1913, based upon the assessments of 1912, equalized in October, 1912, while taxes for 1914 were based upon an assessment value as of March 1, 1914, equalized in October, 1914, and became payable in May, 1915. The evidence is that in 1908, under authority of the county officials, a cruise of the timber lands and a survey of other lands in the county was begun. The cruise was not finished until 1914, but the data obtained were full, and made part of the public records of the county, and were used by the assessor when he made assessments of timber lands for 1913 and 1914.

The maps accompanying the record show that Clallam county is long and narrow, bordered on the east and south by Jefferson county, on the west by the ocean, and on the north by the Straits of Juan de Fuca. In the eastern end of the county is the small town, Sequim. Port Angeles, a city of more than 4000 inhabitants, lies on the Straits, approximately one-third of the distance from the easterly line of the county. A large part of the county is included in a forest reserve,

but in round numbers there are 529,920.06 acres of taxable land, of which over 356,000 acres are timber lands. In 1914 the total assessed valuation of the county was $14,576,197, of which more than $10,-000,000 was the assessment on timber lands. Real estate in cities was ,assessed in 1914 at $2,114,957, and unimproved land, excepting timber lands, at $901,475, and improved land, with improvements, at $746,305.

The zones as created by the assessor for assessment purposes may be briefly described as follows: Zone No. 1 abuts upon the Straits, and extends east and west along the Straits for approximately 65 miles, and back from the Straits into the interior at distances from 1 to 8 miles. Zone No. 2, situate in the interior, is generally south of and adjoining zone No. 1 in part, and runs toward the westerly part of the county, extending southerly to the line of Jefferson county. The most southerly point in zone 2 would be about 30 miles from the Straits, and the most northerly point approximately 5 miles. Appellant Lumber Company owns 18,707 acres in zone 2. Zone No. 3, of much smaller area than zone 2, lies west of Lake Crescent, and is also in the interior and south of the easterly part of zone 1. In this zone appellant Lumber Company owns approximately 3,207 acres. Zone No. 4 lies south of zone 5, and is in the south central part of the county with a northerly line about 8 miles from the Straits. In this zone appellant Lumber Company owns 18,588 acres. Zone No. 5, also in the interior, is situated north of the Soleduck valley and on the westerly slope of a range of mountains, which separates the valley and the lands of plaintiffs from the Straits. Plaintiffs own about 798 acres in this zone. Zone No. 6 adjoins Jefferson county, and is situate south of zone 3, and about midway between the east and west ends of Clallam county. Plaintiffs own 80 acres in this zone.

It is conceded that upon the Straits and immediately adjoining the tidewater (zone 1) there are large bodies of fir, cedar, spruce, and hemlock, and it is beyond dispute that in this zone the lands were properly assessed. It would extend this opinion too far to give the testimony about the topography of the several zones. We gather that, from the east end of the county back to Twin Rivers, which flow to the straits, there was a sloping bench for some 3 miles; the bench being elevated about 100 feet on the shore, line and as much as 500 feet 6 miles back. The country from Twin Rivers is broken, some of it being at an elevation of 2,000 feet. The country included in the several zones is in part broken by mountain ranges. The Hoko river flows northerly into the Straits through the western portions of zones 2 and 1. South of the broken elevated portion along the Soleduck river, which flows westerly from Lake Crescent through much of the timber lands of plaintiffs, in zones 3 and 4, 6 and 2, is a valley for some 20 miles. Still further south of the Soleduck river is the Calawa river and valley, which is separated from the Soleduck by mountainous ridges. The elevations of the ridges vary from 2,500 to 6,000 feet. In zone 4 there are some level benches and rolling country, with higher lands in the northwestern part and mountains toward the Hoko river. There is evidence of feasible railroad routes from the several sections to deep water.

The plaintiff introduced testimony of men of experience in buying and selling timber and conducting logging operations in Washington and other sections. A number of them testified to the effect that land with timber upon it had depreciated since about 1910, and that in 1913 and 1914, upon the interior lands involved herein, $1 per thousand for the fir, spruce, and cedar would be high value, but that such timber upon the Straits might be worth $2 per thousand and hemlock 75 cents, because of its being close to the water. Some of these gentlemen put the value of hemlock in the interior sections at 50 cents per thousand in 1912 and at lower valuations in 1913 and 1914. The higher value which the witnesses put upon the Straits timber was, as indicated, because of superior logging conditions. E. C. Duvall, an expert timber cruiser of long experience, and who knew the country, put the value of fir, spruce, and cedar on plaintiff's lands at $1 per thousand in 1913 and 1914, and of hemlock at 50 cents per thousand, except along the Pysht and Hoko rivers (Straits timber), where fir, spruce, and cedar was worth $2 per thousand and hemlock 75 cents.

On the other hand, the defendants offered evidence from men well qualified to testify concerning the value of timber, and who were in some instances specially familiar with the timber lands of the appellants, as well as with those in the Straits timber zone. Some of these witnesses said that they considered the fir, spruce, and cedar on the appellant's land in the interior as worth $2 per thousand feet in March, 1912 and 1914, and that the price of hemlock varied from $6 to $11 per thousand, and that the timber in the interior zones was worth as much as in the Straits zone. One of the witnesses said that, owing to the character of the land, it would be no more expensive to log into the waters of the Straits from zone No. 1 than from the other zones, and for 1912 and 1914 he put a value upon fir timber in the zone at $1.50 per thousand but that spruce and cedar ought to be worth $2 to $2.50 per thousand. A witness (Newbury), who had been 25 or 30 years in the logging and timber business, said he had been across a portion of the lands of the plaintiffs in Clallam county, and made investigation concerning the value of timber and the conduct of logging operations therein; that he knew the lands along the Straits, and had examined the county cruises in Clallam county; that in examining the timber of the plaintiff he had used an aneroid barometer, and had carefully studied the physical characteristics of the country in the respective zones; that in some instances he had taken up an acre, and counted and measured it, and that as a result his opinion was that on March 1, 1912, 1913, and 1914, the value of the plaintiff's timber was from $1.75 to $2 per thousand, and that the value of the Straits timber was about the same, but he thought hemlock was of no value whatsoever, except for use in logging operations; that he believed that the interior timber could be logged for less than in front—that is, fir, cedar, and spruce. Another qualified witness, Merrill, an owner of timber in Clallam county said he was familiar with timber in the Straits zone and with the timber land owned by the appellants. He considered quality of timber, cost of logging and operating, soil, etc., and thought the timber

in the interior was worth fully as much, if not more, than the timber upon the Straits, and that in 1912, 1913, and 1914 the timber in the interior could have been operated at a profit at $1 per thousand, stumpage, basing that at $2 per thousand. During that time his own business had been operated at a profit at Gray's Harbor and Everett, and his own operations had been profitable more than 25 miles away from market or salt water. There was other evidence, but it is unnecessary to refer to it.

We concede that the witnesses for the appellants had sufficient familiarity with the country and the timber upon the lands of the appellants and the general conditions to entitle their judgments upon values to very high respect, and yet witnesses for the appellees equally well qualified in knowledge and experience have expressed opinions sustaining the values made by the officials.

Turning to the specific figures, we find this: In 1912 the fir, spruce, and cedar timber of the appellants was assessed at 70 cents per thousand feet in one zone, and at 60 cents in another zone. Now, taking the evidence as sustaining a conclusion that the market value of fir, spruce, and cedar at that time was $2 per thousand, we have the assessment made at approximately 35 per cent. of the value. The assessor himself has testified that in putting value upon timber he believed that the sums adopted were about 50 per cent. of the true value of the lands involved; that in 1914 he raised the assessment on fir, spruce, and cedar 10 cents a thousand, from 70 to 80 cents and 60 to 70 cents in certain zones, because he believed that previous assessments had been too low; that he had made an error in the assessments of 1912 because at that time he had had very little information. We then have the result that, with an established value of $2 per thousand feet, the assessment made was 40 per cent. of the market value for 1914. It is also proven that, when the assessed value was raised, it affected all timber lands in Clallam county.

Appellants argue that the evidence shows that their lands are without conveniences for transportation and access to markets, and it would cost a great deal to construct and operate a railroad to transport the timber from the interior lands of the appellants to tidewater. But there was much evidence introduced by the defendants to show that it would cost but little more to construct a railroad in the interior and to log the interior timber than to move and log the Straits timber. The evidence of freight tariffs on logs to be transported by transcontinental railroads does not furnish great aid in estimating the fair cash market value of the timber lands. It is the value of the land with the timber on it in the timber land market that primarily must govern, and the value from that standpoint is not to be controlled by the value of manufactured sawlogs made from the timber after it is felled. There is evidence, however, to the effect that timber, when it reaches Clallam Bay and certain other water points, has a value of $6, $8, and $11 per thousand feet as against the value of $2 per thousand in the tree growing on the lands in the interior zones. The evidence of the assessor was in substance that for 1914 he had used and considered the timber cruises which divided the timber lands into 10-acre tracts and gave the number of trees on each 10 acres,

the average number of thousands of feet, amount of fir, spruce, cedar, and hemlock on each 10 acres, the character of ground, dead timber, burned lands, and also showed character of logging conditions on each 40-acre tract. In 1912 he says that he used the information then at hand, as to kind of timber, surface, and everything of a physical character, and in fixing zones he used his best judgment as to estimated values for timber assessment purposes. The members of the board of equalization were rigidly examined and also testified that in 1912 and 1914 they approved of the assessment rolls prepared by the assessor; that in 1914 they had the cruise books before them; that they weighed the timber estimates and always exercised their best judgment. Appellants have vigorously attacked these statements of the assessor and members of the board of equalization, but we think they have overlooked the whole of the testimony of the officials. We do not controvert the argument that, if there were nothing of substance except mere statements by the officials that they used their best judgment, such statements ought not to count for much against evidence of circumstances and facts which would show that there was no fair ground upon which they could have formed the judgments they did. But, as pointed out, such is not the case here.

[1] We fail to see that in the adoption of the zone system as a basis for assessment and taxation there was inherent error. Of course, an assessor must always be guided by the purpose that the tax levied upon each tract shall be relatively according to its real value. But if he proceeds in good faith on this principle and after examination of the physical location of the lands with reference to the advantages or disadvantages of situation of each tract, contour of the land, the quality and quantity of timber standing thereon and facility for logging, there can be no well founded objection to a classification by convenient area of growth, whether called zones, districts, or tracts. It is easy to understand how differences in value in several areas will arise and must be recognized as of practical importance. We all know, too, that an assessor is oftentimes confronted by a very difficult task in making distinctions in values of unoccupied lands; however, he must make the assessments as the law requires and must do the best he can, and although he has the rules of law to guide him, to a great extent he must use hard-headed judgment, which presumably he will be able and ready to apply to his task. In Doty Lumber & Shingle Co. v. Lewis County, 60 Wash. 428, 111 Pac. 562, Ann. Cas. 1912B, 870, the Supreme Court of the state considered an attack upon an assessment of lumber lands, where, before formal equalization was proceeded with, tentative bases of value had been put upon timber with relation to distances from a commercial railroad. The board of equalization, after hearing, raised the assessments of the lands, not adhering strictly to the tentative bases but considering distance of the property from a logging stream or commercial railroad and the contour of the land as affecting the expense of getting the lumber to market. The court held that establishing the limits in miles as bases of value was not action upon a fundamentally wrong principle, and distinguished the case of Hersey v. Board of Supervisors (decid-

ed in 1873) 37 Wis. 75, cited to us by appellant, by carefully pointing out that in the Wisconsin case a fixed value was placed on standing timber within limits fixed by the authorities, without reference to statutory requirements in Wisconsin concerning logging conditions, quality of timber, or character of soil.

[2] As peculiarly appropriate to the case before us, we quote what the Supreme Court said:

"There is a marked divergence in the opinions of the respective witnesses as to the value of the timber land, but the law put the burden upon the appellants, and the trial court who saw and heard the witnesses concluded that they failed to meet the burden, and we are inclined to take the same view."

And in Louisville & Nashville R. R. Co. v. Greene et al. (decided since the present case was submitted) 244 U. S. 522, 37 Sup. Ct. 683, 61 L. Ed. 1291, we have the last expression of the Supreme Court of the United States, where it was said:

"The findings of an official body, such as the board of valuation and assessment, made—as was the case here—after a hearing and upon notice to the taxpayer, are quasi judicial in their character, and are not to be set aside or disregarded by the courts, unless it is made to appear that the body proceeded upon an erroneous principle or adopted an improper mode of estimating the value of the franchise or unless fraud appears. Pittsburgh, etc., Railway Co. v. Backus, 154 U. S. 421, 435, 436 [14 Sup. Ct. 1114, 38 L. Ed. 1031]; Chicago, B. & Q. R. Co. v. Babcock, 204 U. S. 585, 596 [27 Sup. Ct. 326, 51 L. Ed. 636]."

Our conclusion is that the evidence of the appellee meets any fair criticism of the zone method and that there is no reason for disturbing it. The assessments in the several zones are as follows:

Zone No. 1—1912–1913, fir, spruce, and cedar, 80 cents; hemlock, 40 cents. 1914, fir, spruce, and cedar, 90 cents; hemlock, 40 cents.

Zone No. 2—1913, fir, spruce, and cedar, 70 cents; hemlock, 35 cents. 1914, fir, spruce, and cedar, 80 cents; hemlock, 40 cents.

Zone No. 3—1913, fir, spruce, and cedar, 70 cents; hemlock, 35 cents. 1914, fir, spruce, and cedar, 80 cents; hemlock, 30 cents.

Zone No. 4—1913, fir, spruce, and cedar, 60 cents; hemlock, 30 cents. 1914, fir, spruce, and cedar, 70 cents; hemlock, 30 cents.

Zone No. 5—1913, fir, spruce, and cedar, 40 cents; hemlock, 20 cents. 1914, fir, spruce, and cedar, 50 cents; hemlock, 25 cents.

Zone No. 6—1913, fir, spruce, and cedar, 40 cents; hemlock, 20 cents. 1914, fir, spruce, and cedar, —— cents; hemlock, —— cents.

The Ruddock and McCarthy lands, which were in zone 2, in 1913, were assessed at 70 cents for fir, spruce, and cedar, and hemlock, 35 cents; in 1914, fir, spruce and cedar, 80 cents, and hemlock, 40 cents. Appellants have made a much stronger showing of possible overvaluation of hemlock than of fir, spruce, and cedar. There is much evidence tending to show that valuations of hemlock timber were high, but there is no substantial evidence that any discrimination against the lands of the appellants was had, and there is evidence to sustain the assessment of the hemlock as made by the assessor and sustained by the board of equalization. We are thoroughly satisfied that, if there was any overvaluation, it was due to honest mistake of opinion, and not to fraud. As was said in Olympia Waterworks v. Gelbach, 16 Wash. 482, 48 Pac. 251:

"It is a well-known fact that there is often a wide difference of opinion as to the values of property among persons acting honestly and endeavoring to get at the true value, and, as this question must be settled somewhere, the law has reposed it in the board of equalization, and made their action final."

We understand, of course, that the court, in using this language, did not intend to commit itself to the doctrine that, where the action on the part of the officials was fraudulent, the courts would not interfere. It appears that the value of the hemlock in Clallam county was the same as the value put upon hemlock in other portions of the hemlock belt, or what is spoken of as the "Olympia peninsula timber." Again, appellant's assessment for 1914 was upon a valuation of $1,667,000, which included a value put upon hemlock of $223,426, which is less than 13.5 per cent. of the value of the total valuation put upon the property of the appellants.

Appellants offered much evidence, principally opinions from men versed in realty values, in support of their contention that a fraudulent combination of tax officials existed with the purpose of discriminating against the lands of these several appellants and in favor of other classes of property in Clallam county and in favor of timber lands which were being operated. To meet this, appellees also produced much evidence, but relied largely on the showing of just what prices were paid where actual sales had been had. With respect to real estate in Sequim, comparisons between prices at which a number of lots sold in 1913 and 1914 and the assessed values imposed in 1914 showed that the assessment was 48 per cent. Much other property in the town in 1914 was assessed at 58 per cent. of sale contract prices. There was sharp conflict as to some of the values; but, in the light of the evidence of the actual sales had, it is not for us to substitute our judgment for that of the lower court and the county officials. And like position must also hold in relation to the evidence concerning assessment of farm lands.

It is said that the assessment of Port Angeles real estate was dishonestly made and that values grossly below true values were imposed. The town, so the evidence discloses, had more or less of a boom in 1912, when prices rapidly increased, and considerable property was transferred. But witnesses tell that a change came soon after 1912 when prices fell. Opinions of witnesses as to values in 1914 are radically divergent and wholly satisfactory judgments are not easily arrived at. But the tabulated statements of assessed valuations for 1914, when compared with the valuations placed by several witnesses upon the town property, show that an average assessment of about 50 per cent. was had.

Complaint is made against the assessment of certain personal property—shingle mills, bank stock, and property of power companies. The assessor testified in detail about the condition of the several mills, their machinery, sizes, capacities, age, and locations, and said that he tried to make his assessments on the basis of 50 per cent. of actual market value. Appellants introduced testimony that his assessments were too low, but we find no solid ground upon which to rest a reversal of his judgment.

[3] There was not a proper assessment of the banks in 1914. This was admitted upon the trial. Under the statute of the state (section 9134), the assessment should have been upon the shares of stock at the full and fair value, whereas it was made upon the basis of a per cent. of the capital stock. The chairman of the board of equalization admitted at once that the assessment was wrong, and said the error was because the board did not know any better, and was unable to construe the statute properly, and was never advised of its error by counsel until after the board had acted. The error does not invalidate the assessment. In Doty Lumber & Shingle Co. v. Lewis County, supra, the court said:

"The omission of the assessor to assess property, under a misapprehension of the law, will not invalidate the assessment list. It is the same in legal effect as the casual omission of property through a mistake."

It may be that there was some undervaluation of the plant of the Olympic Power Company; there probably was. The plant was built in 1910, but in 1912 the dam was broken and partly carried away, and as a result the value of the property was much impaired. However, there is nothing of substance to show that the assessment of the authorities was fraudulently made; and surely, when we consider the difficulty of valuing property in the condition existing when the assessment was made, the courts should not disturb the judgment of the local authorities.

We are not at all satisfied by the evidence that there was any corrupt combination between the assessor and the members of the board of equalization for the purpose of overvaluing appellants' lands, or discriminating in any way against them and in favor of other property. The appellants went to the pains of sending an agent from Portland to Port Angeles in 1914 to inquire into real estate values thereabouts. He went and talked with the county assessor and other officials and persons, and assumed to narrate many conversations with the officials, wherein they made statements to the effect that timber was assessed more than any other property, and town property at less than half its real value, which it is now sought to use as admissions by them of intentional undervaluations of town and other property. The officials positively deny many of the statements attributed to them, and declare that they never made statements intending to convey the meanings which the investigating witness gave to them. The District Court rejected the theory of conspiracy, and, without elaborating the evidence introduced by the several parties, our opinion accords with that of the lower court. Granting that, unexplained, much of what the main witness for the plaintiffs testified to tended to show wrongful concert of action, nevertheless the officials met the issue of intentional wrong in a way which dispelled any fair inference of corruption on their part. Olympia v. Stevens, 15 Wash. 601, 47 Pac. 11.

What we have said pertains sufficiently to the more important features of the appeal, and leads us to the conclusion that, while the evidence abounds in diversity of opinions as to correct values, those adopted by the officials are sustained as true to a greater or less de-

gree. Appellants went before the board of equalization, and must now abide by their judgment. If there were some overvaluations or undervaluations, they are to be attributed to mistakes of judgment, and, in the case of the bank stock values, to honest misconstruction of law, but not to intentional, or arbitrary, or fraudulent, overvaluation or omission. And as the evidence fails to show discrimination against the property of any class or owner, or that any fundamental principle of uniformity was violated, the appellants are not entitled to relief in equity. C., B. & Q. Ry. Co. v. Babcock, 204 U. S. 585, 27 Sup. Ct. 326, 51 L. Ed. 636; Templeton v. Pierce County, 25 Wash. 377, 65 Pac. 553; Vancouver Waterworks v. Clark County, 55 Wash. 112, 104 Pac. 180; N. P. R. Co. v. Pierce County, 55 Wash. 108, 104 Pac. 178; Mercantile National Bank v. New York, 172 N. Y. 35, 74 N. E. 756.

The decrees are affirmed.

⊕For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes